JANUARY TERM. 1894. 681

First National Bank of Pensacola et al. v. Wittich.—Syllabus.

FIRST NATIONAL BANK OF PENSACOLA ET AL., APPELLANTS, VS. W. L. WITTICH, APPELLEE.

1. On the hearing of exceptions to an answer an order was made adjudging the answer to be sufficient and dismissing the bill. On application of complainant another order was made on the sixth day after the entry of the former one, reciting that the order dismissing the bill was made through inadvertence, and directing that the same be vacated, and complainant have

leave to reply. Thereupon replication was filed and the cause proceeded regularly to final decree, the defendants participating in the proceedings. *Held,* That it was too late to object for the first time in the appellate court to the method of procedure in vacating the order dismissing the bill.

2. A mortgage covering a stock of merchandise under which the mortgagor is permitted by agreement or understanding of the mortgagee to retain possession and sell in the usual course of business the mortgaged goods, is fraudulent and void as to creditors of the mortgagor, and it makes no difference whether the agreement or understanding be expressed in the mortgage or not. If it was so agreed or understood at the time the mortgage was executed, whether in writing or not, the mortgage security will thereby be rendered void as to the mortgagor's creditors.

3. A mortgage that is fraudulent and void as to the creditors of the mortgagor can not be purged of the existing fraud and rendered valid as to such creditors by any effort on the part of the mortgagee to enforce the mortgage, or assume any rights under and by virtue of it.

4. Where a mortgage of a stock of merchandise is void in law as to the creditors of the mortgagor by reason of permission on the part of the mortgagee to sell the goods in the usual course of business, this will not prevent the mortgagor and mortgagee from entering into an entire new agreement in good faith as to a security on the mortgaged goods; and if, after the making of such mortgage, the mortgagor deliver possession and control of the goods to the mortgagee to be sold under his direction and the proceeds to be applied to the payment of a valid indebtedness, such a pledge of the goods will be good as against the lien of a judgment subsequently acquired, if such hypothecation was in good faith and free from any fraudulent intent.

Appeal from the Circuit Court for Escambia county.

### STATEMENT.

Wittich filed a bill in chancery against the bank and others, and obtained a final decree, from which an appeal was taken.

The case made for Wittich in the bill of complaint, filed on the 6th of February, 1882, is that he was assignee of a judgment obtained on the 23rd day of January, 1882, in the Circuit Court for Escambia county, by F. C. Brent against E. T. Hunt for the sum of $4,663.38, and that execution emanating from said judgment was placed in the hands of the sheriff of said county, and remained unsatisfied at the time of filing the bill. Brent, Hunt, the bank and its officers were made parties defend ant. That the only property belonging to Hunt subject to levy and sale under judgment and execution was a quantity of salt then in warehouses in said county, and if said execution had been levied upon said salt and it offered for sale thereunder, purchasers would have been deterred from bidding therefor, because there was then of record in the record books of said county a mortgage given by said Hunt to the said bank. The mortgage was executed on the 31st day of August, 1881, to secure the sum of $26,408.72, and covers 33,400 sacks of salt, "stored in D. F. Sullivan's warehouse on the wharf of said Sullivan, and 10,000 sacks of salt (then) stored in Wittich's warehouse on the Central wharf, both of said wharves being in the city of Pensacola, Escambia county, State of Florida." It is further alleged that the salt referred to as being subject to levy and sale under the said judgment and execution was part and what remained of the salt covered by said mortgage, and that it was insufficient to satisfy said mortgage debt, and had said salt been offered for sale subject to the lien of the mortgage no purchaser could have been found to bid therefor; that before, at and after the time of the execution of said mortgage the said Hunt was and continued to be a merchant engaged in the business of buying and selling salt, and that the salt

upon which said mortgage was executed constituted his stock in trade, and it was permitted by the said bank to remain in his possession and under his control; that with the knowledge and consent of said bank Hunt continued for some time after the execution of the mortgage to deal with the said salt in his business, to sell large portions thereof from time to time to buyers, and to apply considerable portions of the proceeds of said sales to his own personal and private use; and at the time of the execution of said mortgage it was agreed between the said Hunt and said bank that the former should continue to deal with and sell said salt and apply to his own use portions of the proceeds of said sales. Upon the foregoing allegations it was alleged that the said mortgage was fraudulent in law and void as against the said execution lien. There are other allegations as to the incapacity of the bank to loan to Hunt the amount expressed in the mortgage, but as no point is presented on this phase of the case, no reference need be made to them.

A special prayer of the bill is that Hunt and the bank be enjoined from selling or otherwise disposing of the residue of said salt; that a receiver be appointed to take possession of the same, and that so much thereof as may be necessary, be sold and the proceeds applied to the satisfaction of said execution, interest and costs.

Respondents demurred to the bill on rule day in April, 1882, and on the 10th day of July following, by leave of the court, complainant filed a supplemental bill. The new matter alleged in this bill is that after respondents had been served with process, appeared and demurred to the bill, but before any further proceedings were had in the cause the said bank, "having possession of the salt covered by the said mortgage,

sold the same and realized from the sale thereof a sum greater than will suffice to satisfy the said judgment and execution with interest and costs.'' The special prayer is that the bank be decreed to pay the complainant the amount of said judgment, interest and costs.

Demurrers to the original and supplemental bills were overruled, and the bank and its cashier, W. A. S. Wheeler, answered. The answer denies all fraud in law or in fact, actual or constructive, as charged in the bill, and alleges that the salt described in the mortgage as being in Sullivan's warehouse was the remnant of cargoes purchased and paid for by D. F. Sullivan, and stored in his warehouse, and that the understanding between Sullivan and Hunt in reference to the salt was that the latter should sell the same as he could find buyers, and pay over the proceeds of such sales to the former, to reimburse him for the cost and charges on account of the salt, and the profits to belong to Hunt; that in May, 1881, the bank agreed to pay Sullivan for what then remained of the said salt, and Hunt caused to be made and discounted at the bank the notes mentioned in the mortgage for the money paid by the bank to Sullivan, except for the note given for the purchase of the salt from Wittich, and that it was understood between the bank and Hunt that the salt should remain in the warehouse until purchasers therefor could be found, and that Hunt should make the sales as rapidly as he could and pay over the proceeds to the bank in discharge of said notes. It is further alleged that the only purchase of salt by Hunt, of which respondents had any knowledge, was the salt described in the mortgage as being in Wittich's warehouse, and that to aid in making this purchase the bank loaned Hunt

686 SUPREME COURT.

First National Bank of Pensacola et al. v. Wittich.—Statement of Case.

$2,300, which, with the interest thereon and a balance due by him to the bank and not included in the other notes, constituted the amount of the last note mentioned in the mortgage; that said loan was made with the understanding that Hunt should give a mortgage on the salt in Sullivan's warehouse, as well as that purchased from Wittich, and that Hunt was to make sales of both lots of salt as rapidly as the market would allow, and pay over the proceeds to the bank in discharge of said mortgage notes; and that the object of the bank in aiding Hunt to make said purchase of salt was not to enable him to carry on business as a salt merchant, but the sole purpose was to enable him to command the salt market at Pensacola by buying out a sole competitor; and thereby enable him (H.) the sooner to pay off his indebtedness to the bank, and to the extent and in the manner stated, and not otherwise, it is alleged, that Hunt was engaged in the business of buying and selling salt. · It is also alleged that the salt in Sullivan's warehouse was never in the actual possession of Hunt, as said warehouse from the time the salt was stored therein until the last sack was sold and shipped with the consent of Sullivan, who was president of the bank, was in his possession and the salt in complainant's warehouse was under his control until he delivered it from time to time upon the order of Hunt as he effected sales thereof.

The answer denied that either before or after the execution of the mortgage the officers of the bank had any understanding or other agreement with Hunt in reference to the sale of said salt, except that he should sell the same as rapidly as he could and pay over the the proceeds of said sales to the bank in discharge of said notes, and if he appropriated the proceeds of such sales above the expenses necessarily incident to

JANUARY TERM, 1894.                    687

First National Bank of Pensacola et.al. v. Wittich —Statement of Case.

the business to his own use, he did so without knowledge, concurrence or consent of the officers of the bank.

It is also alleged that the foregoing arrangement continued until about the first of November, 1881, when the bank, for the purpose of exercising more control over the sales of said salt, agreed with Hunt that the sales should be made under the immediate direction of the bank, and that Hunt should use his best exertions to find purchasers, secure railroad transportation and to attend to the shipment of salt, for which he was to receive from the bank $150 per month, and that this arrangement continued until about the first of December, 1881, after which time the residue of the salt was sold by other agents for the best prices which could be obtained, and applied to the discharge of the said mortgage notes, leaving a balance due the bank on the 23rd day of May, 1882, of $4,646.26 which is still unpaid.

The answer further alleges that when the bank advanced for Hunt the $2,300 to pay Wittich for the salt in his warehouse it did so upon the basis of one-third of the price, 68 cents, and upon the representation made by Wittich to Hunt, and by Hunt to the bank, that said salt amounted to 10,000 sacks, and said representation was untrue, as there were but 8,253 sacks; that by said misrepresentation complainant Wittich obtained from the bank through Hunt $401.81 in cash, and an acceptance for $786.15 more than he was entitled to, and that he, Wittich, immediately after receiving said acceptance discounted it to Brent, who as a *bona fide* purchaser without notice, obtained judgment for the full amount of said note against Hunt, and afterwards assigned said judgment to complainant as alleged in the bill of complaint.

The other facts necessary to be given will appear in the opinion.

*R. L. Campbell* for Appellants.

*Blount & Blount* and *John C. Avery* for Appellee.

MABRY, J.:

The petition of appeal does not present any question as to the ruling of the court on the demurrers to the original and supplemental bills, and the consideration of the case here will not involve such ruling.

It is insisted that when the final decree was rendered in favor of appellee against the bank, no case was then pending in the court against it in which such decree could be rendered. After answer was filed by appellants to the original and supplemental bills appellee filed exceptions to the answer, and upon hearing of the exceptions the court made the following order, *viz:* "This case coming on to be heard on bill and answer and exception to answer, and was argued by counsel; and on consideration thereof, it is ordered, adjudged and decreed that said answer is a sufficient defense to the bill, and that the said bill be dismissed at the cost of the plaintiff." This order was made at chambers October 24th, 1885, and on the 31st of the same month the following order was made in the cause, *viz:* "This cause coming on to be heard upon the application of the solicitors for complainant for an order modifying the decree entered October 26th, 1885, and that that portion of said decree dismissing the bill be vacated and so that the complainant have leave to reply, and the said order of dismissal having been entered through inadvertence, it is therefore ordered that so

much of the said decree as orders the dismissal of the bill be and is hereby vacated, and that the complainant have leave to reply, and that three months after filing of replication be given to the parties for taking testimony."

The contention is that the decree dismissing the bill was final, and after entry, or enrollment, could only be opened by bill of review. The order dismissing the bill is dated the 24th of October, 1885, and the order modifying it, made on the 31st of the same month, recites that it was on application of counsel for complainant. When the application was made is not stated, but it was brought on for a hearing on the 31st of the month. The order recites that the decree dismissing the bill was "entered through inadvertence.' Every reasonable presumption is in favor of the ruling of the court until the contrary is shown, and on this record it must be assumed that for some cause the decree was entered through inattention or by mistake. It is not denied of course that the court had the power in some way to correct such an error. On the record before us we think appellants are in no condition to question in this court the order modifying the one dismissing the bills. After this order was entered, the general replication was filed and the cause proceeded to final hearing, and it is made to appear that appellants without making any objection to the order, participated in said proceedings, contested appellee's right to a decree on the merits of the bills, and the decree in the cause recites that the final hearing, upon the pleadings and proofs, was on the application of defendant's solicitors. The objection to the order modifying the decree dismissing the bill is raised for the

first time in this court, and we think it comes too late. Peck vs. Spencer, 26 Fla., 23, 7 South. Rep., 642.

The ground of the appeal involving the merits of the case and argued here is that "appellee was not entitled to relief upon the pleadings and evidence." We have held that a mortgage covering a stock of merchandise, under which the mortgagor is permitted by agreement or understanding of the mortgagee to retain possession and sell the goods at discretion, or in the usual course of business, is fraudulent and void as to existing creditors of the mortgagor, and it makes no difference whether the agreement or understanding in reference to the sale of the goods be expressed in the mortgage itself or not. If it was so agreed or understood at the time the mortgage was executed, whether in writing or parol, the security is thereby rendered void as to the creditors of the mortgagor. Eckman & Vetsburg vs. Munnerlyn, 32 Fla., 367, 13 South. Rep., 922. The decision cited followed the former one of this court on the subject (Logan vs. Logan, 22 Fla., 561), and the cases sustaining the rule announced by it. If a stipulation in a mortgage of merchandise, to the effect that the mortgagor may retain possession of the goods and sell them in due course of trade avoids the security, it follows logically that such an agreement in parol will have the same effect. The cases referred to in this court are on the side of those decisions holding that such an understanding or agreement, whether expressed in the mortgage or shown by proof *aliunde*, renders the mortgage fraudulent in law. After what has been said in the Eckman-Munnerlyn case it is not necessary to go into any further discussion of the point. Speaking for myself, had the point been an open one in this State, I would have preferred

the decisions holding that the question is not one of law so much as it is one of fact and good faith, under the circumstances of each case. The question, however, has been settled here as above stated. But it has never been decided here that an agreement, whether expressed in the mortgage or resting in parol, to the effect that the mortgagor may retain possession of the merchandise mortgaged, sell the same and apply the proceeds exclusively to the payment of the mortgage debt, will render the mortgage security void. The mortgage on the salt in the case before us is not void by reason of any of its stipulations, as there is no express agreement in it in reference to the possession or sale of the salt by the mortgagor. Its supposed infirmity is based upon an alleged agreement or understanding between the mortgagor and mortgagee that the former should retain possession of the salt and sell the same in the usual course of trade, or that the mortgagee knowingly permitted the mortgagor, after the execution of the mortgage, to continue to sell the salt and apply the proceeds in part to his individual use and private account. The answer denies, in effect, the possession of the salt by Hunt, the mortgagor, and also alleges that it was sold under an agreement that the proceeds should be applied to the mortgage debt. The testimony shows, we think, that from the time of the execution of the mortgage in August, 1881, up to November the first of that year, the salt was in the possession and under the exclusive control of the mortgagor. The fact that it was stored in warehouses that did not belong to him does not alter the situation, as it is clearly shown that he paid storage on the salt, and it was during the time mentioned entirely under his control. The decree of the court was against the bank, the mortgagee, for the

amount due on appellee's judgment, and was evidently based upon the view that the mortgagor, with the consent and understanding of the mortgagee, continued after the execution of the mortgage to sell the salt in the usual course of trade, and apply the proceeds in part to his individual use. Although it can not be affirmed on the record before us that there was an express agreement between Hunt and the bank when the mortgage was executed that the former should sell the salt in the usual course of business and dispose of the proceeds in his discretion, yet the evidence is sufficient to sustain the conclusion that there was an implied understanding at the time that such a course of business should be pursued in reference to the sale of the salt. For several years before the commencement of his business relations with the bank Hunt had been engaged as a merchant in the purchase and sale of salt in the city of Pensacola, and from May, 1881, to the 31st of August of the same year had procured from the bank, without giving any security therefor, money with which to carry on the business. On the date last above mentioned the mortgage was executed to secure what was then due the bank, but it is clearly shown that there was no change thereafter in Hunt's method of business in reference to the sale of the salt up to November, 1881, and that the bank with full knowledge permitted and acquiesced in such continued course of business. We would not be authorized on the record before us to disturb the conclusion of the chancellor that there was at the time of the execution of the mortgage an implied understanding between the bank and Hunt that the latter should dispose of the salt mortgaged in the usual course of business and use the proceeds as he saw proper. This conclusion will sustain a decree that the

mortgage was void in law as to the creditors of
Hunt. But in addition to the allegation that Hunt
was to sell the salt after the execution of the mortgage
and apply the proceeds to the mortgage debt, the an-
swer further avers that such arrangement continued
until about November first, 1881, when the bank, for
the purpose of exercising more control over the sales
of said salt, agreed with Hunt that the sales should be
made under its immediate direction, and that he
(Hunt) should use his best exertions to find purchasers,
secure railroad transportation and attend to the ship-
ment of the salt, for which the bank was to allow him
$150 per month, and that this arrangement continued
until about December first, 1881, after which the resi-
due of the salt was sold by other agents for the
best prices that could be obtained, and applied to
the said mortgage notes, leaving a balance due of $4,-
646.26.

Only two witnesses were examined in the case—E.
T. Hunt and L. P. Knowles—and they for complain-
ant. Hunt testifying in reference to his mode of liv-
ing and expenses after the mortgage was executed,
says that there was no change in the particulars men-
tioned until the business was taken out of his hands .
and he received a salary. He also says that there was
no change in his method of doing business until the
bank took charge of the salt when he, for two months,
was paid $150.

Knowles says there was no change in the method of
conducting said business until November first, 1881,
and at that time the bank took charge of the salt and
allowed Hunt a salary.

The conclusion that the mortgage on the salt was
void as against Hunt's creditors makes it impossible
for the bank to rely upon it in this case as any se-

curity for its claim against him. The rule is that if the mortgage is fraudulent and void as to creditors, no effort to enforce it, or assuming control or possession thereunder, can purge it of the existing fraud and render valid as against creditors an instrument which the law declares to be fraudulent and void. Wells vs. Langbein, 20 Fed. Rep., 183; Blakeslee vs. Rossman, 43 Wis., 116; Stein vs. Munch, 24 Minn., 390; Chenery vs. Palmer, 6 Cal., 119; Dutcher vs. Swartwood, 15 Hun, 31. The fact, however, that the mortgage given by Hunt to the baak' was void as to his creditors by reason of the permission given him to sell and dispose of the mortgaged property in the usual course of trade, did not preclude the bank from entering into any other valid *bona fide* arrangement with Hunt before complainant's judgment lien was obtained, by which a superior right to be paid out of Hunt's property was secured. The answer of the bank in effect sets up that the old course of dealing by Hunt with the property described in the mortgage was interrupted about November first, 1881, three months before the judgment lien attached, when an agreement was had with Hunt by which he was to have a salary for selling the salt under the immediate direction of the bank. The testimony shows without any contradiction that when this agreement was made with Hunt the business was taken out of his hands, and the salt taken charge of by the bank. The bank had no authority or power given it by the mortgage, if valid, to assume such control and ownership over the salt. Our statute provides "that a mortgage is and shall be held in our courts a specific lien on property therein for a specific object, and in point of fact, as well as law, the mortgagee is incapable of acquiring possession until after a decree of foreclosure, and then only by bidding

JANUARY TERM, 1894. 695

First National Bank of Pensacola et al. v. Wittich.—Opinion of Court.

and outbidding all competitors in market.'' The only way that the bank could have legitimately gotten control and charge of the salt was by agreement and consent of Hunt, and on the record before us we think it is sufficiently shown that he consented and agreed for the bank to take charge and control of the salt for the purpose of selling it and applying the proceeds to the payment of its debt. A delivery of the property into the charge and control of the bank with authority to sell and apply the proceeds to the payment of a specified debt would be a pledge of the property for that purpose, and, in the absence of any fraud in fact, would be valid as against judgment liens subsequently acquired. We do not understand that it is claimed here that there was any fraudulent intent on the part of either Hunt or the bank in delivering the salt into the control and charge of the latter to pay a valid claim then existing. An examination of the testimony leaves no doubt in our mind that such a claim could not be sustained if made. Hunt owed the bank a valid debt, and he had a right, if he saw proper, to deliver his property to the bank to be sold and applied to that debt. The testimony shows that he did that with the salt described in the mortgage in question before the complainant's judgment was obtained, and we see nothing in the record sufficient to impeach the good faith of the transaction. The placing the bank in charge and control of the salt, so far as appears here, was independent of the mortgage, as no such rights could grow out of the mortgage itself, and was for the purpose of giving a new and independent right. This being the effect of the testimony, we think the chancellor erred in decreeing in favor of complainant on it.

The decree will, therefore, be reversed, and it is so ordered.