WILLIAM SMITH, APPELLANT, VS. JAMES H. WHIT-
FIELD AND JAMES W. SANDERS, APPELLEES.

1. An appeal from an order dissolving an injunction does not, of
itself, reinstate the injunction, but an order directing the ap-
peal to operate as a supersedeas, and a compliance with the
terms of the order, does give it such effect.

2. While a supersedeas perfected on an appeal from an order dis-
solving an injunction has the effect to reinstate it, it does not
retroact so as to deprive strangers to the litigation of interven-
ing rights *bona fide* acquired.

3. Proceedings in contempt are criminal in their character.

4. S. filed a bill against W. and S. to enjoin the removal of phos-
phate rock taken from the soil, and the injunction prayed for
was granted December 26th, 1895, but dissolved on the 3d of
January following; an appeal was entered from the order dis-
solving the injunction on January 31st, and supersedeas per-
fected thereon February 3d, 1896; on the 27th of January,
1896, intervening the dissolution of the injunction and the ap-
peal with supersedeas, W. and S. divested themselves of all in-
terest in the rock and delivered it into the actual possession of
a third party in no way connected with the litigation and with-
out actual knowledge thereof: *Held*, Not to be a contempt of
the supersedeas for such third person to ship or dispose of the
rock after the supersedeas was perfected, nor would it be a vi-
olation of the injunctions for persons to aid him in so doing.

Appeal from the Circuit Court for Marion
county.

### STATEMENT.

In October, 1895, Smith filed a bill in the Circuit
Court for Marion county against Whitfield and San-
ders, and therein alleged that in October, 1876, he
made homestead entry upon the S. E. ¼ of N. E. ¼ and
N. E. ¼ of S. E. ¼, Sec. 12, Township 15, S., Range 19
East, in said county; that afterwards, in December,
1883, he relinquished his entry to Moses Simmons and

James A. Curry, but the latter never perfected their homestead entries, and the same were cancelled by proper authorities of the United States in December, 1886, at which time complainant filed pre-emption declaratory statement for said land, and which statement was of record and uncancelled in the United States land office; that complainant continued to reside upon, cultivate and improve the land as his homestead for a number of years thereafter, but being ignorant and not advised as to his duty in the premises, he did not make proof under his pre-emption claim, but continued to reside on the land, as he had done for a number of years prior thereto; that thereafter, in 1887, a contest arose between complainant and the Florida Central and Peninsular Railroad Company as to the right to said land, the company claiming under a Congressional act of June 22d, 1874, and induced complainant to believe his homestead claim was forfeited, but he continued the contest, notwithstanding he had purchased from the company its title, or pretended title, to the land; that the contest through all the land departments, including the department of the Secretary of the Interior, was decided in favor of complainant, and the land was awarded to him on the contest; that pending the controversy the complainant was not permitted to receive a receipt from the land office for his entry last made upon the land in 1881, but he was entitled thereto, and had continued his residence on the land the necessary period of time to invest him with a good title to the same under the homestead laws of the United States; that fearing the result of the contest, and being desirous of preserving the improvements he had made upon said property, complainant purchased from the said railroad company whatever

interest it had in and to the N. E. ¼ of S. E. ¼ of said section, township and range, and thereafter made a temporary absence from the property, but before this time he had resided upon and made the necessary cultivation to entitle him to a patent to the land, and that he moved therefrom because of the delay incident to the final adjudication of the contest, but with no intention whatever of abandoning said land; that defendants Whitfield and Sanders took advantage of the pendency of the said contest suit and the temporary absence of complainant and went upon the premises and commenced digging and removing therefrom phosphate deposits thereon, and they undertake to justify under some pretended right, the exact nature of which was unknown to complainant, but without any validity whatever; that the portion of the land upon which defendants had trespassed was wild and unimproved, and its chief value was the phosphate rock deposited thereon, and if this was taken away the land would be of no value, or comparatively so; that defendants were actually engaged in mining and making large excavations in the earth and removing the rock therefrom, thereby destroying the value of the property for any purpose, and were absolutely insolvent; that they had some rock then on the ground, the exact quantity not known to complainant, and were digging more daily and carrying it off. It was also alleged that complainant, on the 31st day of December, 1890, presented an application to homestead the land, tendering at the time the necessary money, and alleging that he had continued his residence on the land from the latter part of 1881 to the date of the application. An injunction against further mining or removing rock from the land described, or from removing any phosphate

that had been dug thereon, was prayed for and a reference was made to a master to take testimony and ascertain whether or not an injunction should be allowed.

It appears from the testimony introduced on the reference that a contest arose on Smith's application to prove up his homestead, and the local United States land office for Florida decided in his favor on the testimony, and issued to him a final receipt calling for a patent. The testimony before the land department and the decision of the local officers thereon were before the master and reported by him with other evidence, with recommendation that the injunction be allowed.

Complainant subsequently filed what is called an amended and supplemental bill, referring to the proceedings under the original bill stating that an injunction was granted thereon by the court, and further alleging that at the time of filing said bill defendants were digging and removing phosphate from the land described therein, and that they continued with renewed force to dig phosphate thereon and remove it to a tract of land nearby where they had mining operations located; that pending the application for an injunction under the original bill, defendants removed all the phosphate dug from the land, and it was their intention to ship or dispose of the same, claiming that to do so would be no violation of the injunction granted; that the phosphate dug and removed from said premises pending the granting of the injunction under the original bill amounted to 11,600 tons, and defendants would ship the same unless restrained by the court. The allegation of defendants' insolvency made in the original bill is repeated. The prayer is

for an injunction against the shipping, removing, sell-ing or encumbering the phosphate rock that had been dug and removed from the land described. On De-cember 26th, 1895, the injunction prayed for was granted.

Defendants answered and then moved to dissolve both injunctions granted, and the one allowed on the amended and supplemental bill was dissolved on the 3d day of January, 1896. From this order an appeal was entered by complainant on the 31st day of the same month to the present term of this court.

Upon an inscription of a certified transcript of the record the Chief-Justice made an order on the first day of February, 1896, that the appeal operate as a super-sedeas upon appellant entering into such bond as to amount and conditions as should be prescribed by the Circuit Judge. In pursuance of this order the Circuit Judge prescribed the amount and conditions of the bond, and it was filed and approved on the 3d day of February, 1896.

A rule *nisi*, based upon affidavit of appellant, has been issued against James H. Whitfield, James W. Sanders and A. Trubenbach to show cause why they should not be held in contempt for a violation of the supersedeas. The rule, after reciting the granting of the injunction against shipping, removing, selling or encumbering the phosphate rock dug and removed from the premises in question, the dissolution of the injunction, the appeal and perfection of the superse-deas thereon, alleges that Whitfield and Sanders, after due notice of the supersedeas, and in open violation of the injunction, or supersedeas order, did, on the 11th of April, 1896, sell, ship and remove a portion of the rock from said land, to-wit: about two hundred

tons, and that A. Trubenbach, who knew of said injunction and all of the proceedings in said cause, aided and assisted the said Whitfield and Sanders therein.

Whitfield and Sanders answered: 1st. Denying any violation of the injunction or supersedeas order as alleged. 2d. That the rock mentioned in the rule was shipped and removed by the Anglo-Continental Guano Works, and one James C. Gibson, employed by said company, superintended and managed said shipment and removal of the rock. 3d. That from the 23d of January, 1895, to October 11th of same year respondents had received advances from said company, and had executed to it nine bills of sale, aggregating over 4,000 tons, to secure said advances; that on the 27th of January, 1896, they executed to said company a further instrument of writing, thereby turning over and delivering to said company full control and possession of said rock, with full right to remove and ship the same, and since said date respondents have had nothing to do with said rock or any part thereof, or with any shipment or removal of the same; that said instrument was executed at the instance of A. Trubenbach, agent of said company, and was done in good faith, with no intimation that any appeal was contemplated from the order dissolving the injunction. 4th. That at least five hundred tons of said phosphate rock were mined by respondents from other lands than that described in appellant's bill. 5th. That said bills of sale and the instrument of writing of January 27th, 1896, and all transactions, thereunder were in pursuance of a contract made by respondents with said company in December, 1894, whereby respondents contracted to deliver 5,000 tons of phosphate rock from

June to October, 1895, but on account of the condition of the market said company requested respondents to allow rock to remain, and be shipped at later dates. 6th. That the advances made by the said company to respondents, or a large portion of them, were used by them in mining said rock under said contract, and that for a greater portion of the year 1895 appellant was employed for wages by respondents in mining the very rock which is the subject matter of this controversy. 7th. That all the rock which was mined from lands in controversy was carried therefrom to the phosphate plant of respondents, situated on another tract of one-fourth or one third of a mile distant, and there prepared for market.

A. Trubenbach answered: 1st. That he has been the Florida representative of the Anglo-Continental Guano Works, and as such has transacted the business of the company in buying and shipping phosphate rock in this State, and that all he has done in relation to the rock mentioned in the rule was done as such agent. 2d. From the 23d of January, 1895, to the 11th of October of same year the said company advanced to Whitfield and Sanders $13,507 upon said rock, for which advances the company took bills of sale or mortgages from them, copies of which are attached to and made a part of the answer, and the money so advanced was used by Whitfield and Sanders in their mining operations, that in September, 1895, about 1,300 tons of said rock were shipped by respondent, leaving a balance of 3,200 tons covered by the bills of sale; that the rock removed on April 11th, 1896, and mentioned in the rule, was a part of the 3,200 tons; that since October 11th, 1895, respondent, as such agent, has made other payments to

Whitfield and Sanders, and at the time of filing the answer the total indebtedness against the 3,200 tons of rock amounted to $12,000. 3d. That on the 27th of January, 1896, Whitfield and Sanders executed to said company an instrument (made an exhibit as part of the answer) authorizing it to remove and dispose of all the said rock under the terms of the instrument, and at the time of its execution neither Whitfield and Sanders, nor respondent, had any idea that an appeal would be taken from the order dissolving the injunction; that the said instrument was executed by Whitfield and Sanders in good faith to afford further security to said company for the amount of money due it from them, and that since said date respondent, as agent for said company, has had the actual possession of all said rock. 4th. That a short time prior to April 11th, 1896, respondent employed James Gibson to manage and superintend the loading of said rock, and all the rock mentioned in the rule was so removed and shipped by Gibson as employe of respondent, and not by Whitfield and Sanders, and the same was done under the legal rights of said company to the possession and disposal of the said rock. 5th. That respondent has never been served with any notice of said supersedeas, nor had he any knowledge whatever of any supersedeas order made in said cause until served with the rule *nisi*, though respondent knew appellant had obtained an injunction prohibiting Whitfield and Sanders from mining. 6th. At the time the rock was removed respondent was expecting the arrival of the steamer "Citte de Messina" at Fernandina, Florida, due April 15th, which steamer has since arrived; that respondent was obliged to ship said rock under orders from his company, and a failure to load said vessel

would have involved great loss and damage to the company. 7th. Respondent denies each and every allegation in the rule in relation to himself, and avers that in no manner has he aided and abetted Whitfield and Sanders in violating said injunction order, and that they have not removed said rock, or any part of it; and further, in the shipment of said rock he had no intention of violating any orders of this court in relation thereto, but has acted upon what he was advised was the legal right of said company, to take and remove said rock.

Issue was joined upon portions of the answers and objections, by way of demurrer, made to other portions. By consent of parties a master was appointed to take testimony, and upon his report all the matters are submitted for the consideration of the court.

The opinion makes such reference to the facts as is deemed necessary.

*W. S. Bullock* and *W. S. McConathy*, for the rule *nisi*.

*Anderson* and *Hocker, Contra.*

MABRY, C. J.:

From the transcript of the record filed here in the appeal of Smith against Whitfield and Sanders it appears that an injunction was granted on the original bill filed by Smith, the complainant below and that the court refused to dissolve this injunction on motion made for that purpose. The order of the court allowing this injunction is not found in the record, but the order denying its dissolution is presented. The injunction granted on the amended and supplemental bill was dissolved on the 3d of January, 1896, in the

same order in which the dissolution of the injunction on the original bill was denied, and it is an alleged violation of the supersedeas based on the appeal from that portion of the order dissolving the injunction that is the subject-matter of the present investigation. The supplemental bill alleges that pending the application for an injunction on the original bill, defendants Whitfield and Sanders dug from the land in question phos-phate rock and moved it to other land nearby where they had mining operations, and the injunction granted on this bill was against shipping, removing selling or encumbering the rock that had been so dug and removed. The appeal from the order dissolving the injunction was entered on the 31st of January, 1896, and the supersedeas on this appeal was perfected on the 3d of the following month. Whitfield and Sanders were served with notice of the supersedeas when perfected, but Trubenbach was not, and he was not a party to the litigation between them and Smith. The rule charges that Whitfield and Sanders, in open violation of the injunction or supersedeas order, did, on April 11th, 1896, sell, ship and remove about ten car loads—two hundred tons—of the rock from the land therein mentioned, being the same described in the bill, and that Trubenbach with knowledge of the injunction and all the proceedings in the cause, aided and assisted them therein. Considered as an entirety, the rule sufficiently alleges that Whitfield and Sanders, on the date mentioned, in violation of the supersedeas order granted, did sell, ship and remove a portion of the rock dug on the land described in the bill, and removed it to land nearby, and that Trubenbach, with knowledge, aided and assisted them in so doing.

Dealing with the case against Trubenbach first, it is

made to appear that he, as agent for the Anglo-Continental Guano Works, entered into contracts, in December, 1894, with Whitfield and Sanders for the purchase of five thousand tons of phosphate hard rock to be delivered in 1895. The contracts recite that Whitfield and Sanders had, on the dates mentioned, sold to the Anglo-Continental Guano Works five thousand tons of dried Florida hard rock, of specified quality, and at price mentioned free on cars at a designated place. One-half the rock was to be delivered June-August, and the other half August-October, at buyer's option, in the year, 1895, and there were stipulations as to the weighing, sampling, analyzing and paying for the rock. The railroad weights, less one per cent., were to be taken, and the moisture (determined at 212 degs. F.) to be deducted from weight, not to exceed two per cent. The sampling at port of shipment was at sellers' expense, and certain named persons were to analyze for the respective parties, and in case of difference of more than one per cent. a third analysis was to be made, and the mean of the nearest result taken for the invoice. Payment was to be made net cash on receipt of analysis. The August-October delivery was not made at the time specified in the contract, but the postponement was at the instance and for the convenience of the buyer. In consequence of trouble in securing transportation, or the condition of the market, Trubenbach asked that the second delivery be postponed, and after some delay Whitfield and Sanders demanded that the rock be shipped, or paid for without shipping, as they needed money. It appears that advancements of money had been made on the contract, and some time between the 20th and 27th of January, 1896, Trubenbach caused an estimate of the rock on

hand to be made, and upon this estimate paid Whit-
field and Sanders $2,600 more on the rock. The latter
on the date last mentioned executed and delivered the
following paper, *viz:*

"A. Trubenbach, Esq.,

Agent Anglo-Continental (late Ohlendorffs) Guano
Works.

We, the undersigned Whitfield and Sanders, hereby
deliver possession to you of certain phosphate rock
(about 3,500 tons) now lying and piled at our mine,
Early Bird, Fla., and being the same rock upon which
you hold sundry bills of sale or mortgages. We au-
thorize you to remove and dispose of same as you may
see fit, you accounting to us for value of said rock
against any indebtedness due upon contract after de-
ducting the necessary expense of removal of said rock
from the point where it now lies to the main track of
the F. C. & P. R. R." Trubenbach immediately took
possession of the rock under this instrument, posting
notices that the same belonged to the Anglo-Conti-
nental Guano Works, and retained possession until
the rock was removed in April following. All the
parties regarded the transaction of January 27th as an
absolute transfer of the rock to the Anglo-Continental
Guano Works in consideration of what had previously
been advanced, and what was at that time paid, on the
rock. The estimate upon which the further sum of
$2,600 was paid proved to be too large, and Whitfield
and Sanders were in fact then over paid for what rock
was delivered. On the 6th of April, 1896, Trubenbach
instructed one Gibson to load the rock on cars for ship-
ment, and he proceeded to the mine where the rock
was situated, some fifteen miles from Ocala, and com-
menced loading on the 11th of the month. On that

day five or six cars were loaded, and by the 25th following all the rock was shipped. The shipping of the rock was under the exclusive management of Gibson, who was acting under written instructions from Trubenbach, and the testimony shows that the latter had no knowledge, on the 27th of January, 1896, when the transaction of that date took place, of any litigation between Smith and Whitfield and Sanders. He had, of course; no knowledge then of any supersedeas order made in the litigation, as there was none in existence at the time. Whether Trubenbach had knowledge of the supersedeas order on the 6th of April when he directed Gibson to move the rock, is not clear from the evidence. Trubenbach says he did not know of it at that time. Sanders testified that he spoke to him about the injunction against mining 'rock along after Christmas, but did not tell him at any time of the injunction against removing the rock in question. They seem to make a distinction between knowledge of the injunction against mining the land and the supersedeas granted on the order dissolving the one against selling or removing the rock that had been dug and removed from the premises. There are circumstances independent of the testimony of Sanders and Trubenbach bearing on the question of the latter's knowledge of the supersedeas order when the rock was ordered to be moved by Gibson, but without determining this point, it is clear that when the transaction of January 27th, 1896, took place the injunction against removing the rock had been dissolved, and Trubenbach then had no knowledge in fact of any litigation between Smith and Whitfield and Sanders. The appeal, subsequently entered from the order dissolving the injunction mentioned did not, of itself, reinstate the injunction, but

the order directing it to operate as a supersedeas and the compliance with the terms thereof did have that effect. McMichael vs. Eckman, 26 Fla. 43, 7 South. Rep. 365. While the supersedeas had the effect stated, it is not contended, as we understand, that it would retroact so as to deprive strangers to the litigation of intervening rights *bona fide* acquired. In our opinion it could not have such effect. Archer vs. Hart, 5 Fla. 234; State vs. Johnson, 13 Fla. 33. Under the showing made, the Anglo-Continental Guano Works obtained not only the actual possession of the rock for valuable consideration paid, but, as against Whitfield and Sanders, the absolute right of disposing of the same, and that too before any appeal was entered or supersedeas granted. First National Bank of Pensacola vs. Wittich, 33 Fla. 681, 15 South. Rep. 552. It is insisted that the entire dealing between Whitfield and Sanders and Trubenbach was a subterfuge resorted to for the purpose of evading the supersedeas, and that the transaction of January 27th did not really take place at that time, but was an afterthought. If we were satisfied that such was the case, prompt punishment would be visited upon all parties concerned, but a careful examination of the evidence does not impress us with this view. The contracts made in 1894 were before any litigation arose between Smith and Whitfield and Sanders, and were undoubtedly genuine, and there is really no impeachment of the showing that the transaction of January 27th, 1896, did at that time take place. The agent of the Anglo-Continental Guano Works would not, in our judgment, subject himself to liability as for a criminal contempt in asserting whatever rights his company *bona fide* acquired by paying for and taking pos-

session of the rock before the supersedeas was granted. Whether the rights acquired by the Anglo-Continental Guano Works were in fact superior to Smith's, is not involved, and if he desired to question such rights, should have impleaded the company in some way. The rule charges Trubenbach with aiding and assisting Whitfield and Sanders in moving the rock on the 6th of April, 1896. The testimony does not show any aiding and assisting in the shipment on the part of Trubenbach, but it appears that he alone was the moving party in what was done. Contempt proceedings are criminal in their character, and some strictness is required. Whether a charge for aiding and assisting another in doing an act will be sustained by proving the doing of the act by the party alone, we need not consider, as the rule against Trubenbach must be discharged for the reasons given.

As to Whitfield, there is no ground for complaint. It appears from his testimony, not contradicted, that before the 27th day of January, 1896, he had sold his interest in the firm of Whitfield & Sanders, and it is not shown that he had anything to do with the shipping of the rock in April following. He does say that Sanders negotiated the transaction of January 27th, by which the rock was transferred and delivered to the Anglo-Continental Guano Works, and that he, Whitfield, knew of it and approved it. But at that time there was no injunction pending against the selling or removal of the rock, as no appeal had then been entered from the order dissolving the injunction granted, and the testimony of all parties concerned is to the effect that the transaction of January 27th, by which the Anglo Continental Guano Works acquired the

possession and control of the rock was in good faith, and for a *bona fide* consideration. The proof is not sufficient to show that Whitfield had any agency in the removal of the rock in April, and we have no hesitancy in discharging the rule as to him.

Sanders did not in person engage in the removal of the rock, nor did he assert any ownership or control over the same after the 27th of January, 1896. But while he did not so far as the evidence shows, personally direct the removal of the rock, nor personally engage in its removal, his conduct in reference to the same is such as to bring him under condemnation for a violation of the order of this court, had he been in possession or control of the property when the supersedeas was perfected. He was present when Gibson was having the rock put on the cars and said nothing about the supersedeas. He notified, as he admits, parties that they could get employment in loading the cars, and on one occasion took money from Trubenbach out to the mine for the hands engaged in loading the cars, and did other things inconsistent with the proper observance of the mandate of a court in reference to the property, had it been in his possession or subject to his control. If delivery had not been made before the supersedeas was perfected, though an agreement for the transfer had previously been entered into, neither Whitfield nor Sanders could, under the terms of the supersedeas order, have subsequently made delivery of the property, or passively stood by and allowed it to go out of their possession; but that was not the case. Actual transfer and delivery of the rock to the Anglo-Continental Works were made before Smith entered his appeal, and Whitfield and Sanders had no further control over the property at that time.

It not being a criminal violation of the supersedeas order for the company to assert such rights as it had acquired before the same was granted, what Sanders did was not in furtherance of an illegal purpose. Our conclusion is, that the rule *nisi* should be discharged generally as to all the defendants.

In disposing of the questions under the rule we have considered only such portions of the answers as sufficiently set up the defenses upon which our conclusions are based. As the grounds of defense which we have considered in the opinion are sufficiently alleged, it is not deemed necessary to refer to other allegations in the answers which may be insufficient on demurrer.

Order to be entered as directed.