88 So.2d 891 (1956)
SOUTH DADE FARMS, INC., A FLORIDA CORPORATION, AND JAMES SOTTILE, JR., AND WILLIAM SOTTILE, PETITIONERS,
v.
FREDERICK C. PETERS AND BERENICE TODD PETERS, RESPONDENTS.
Supreme Court of Florida, En Banc.
April 4, 1956.
Rehearing Denied July 31, 1956.
*892 Caldwell, Parker, Foster & Wigginton, Tallahassee, Claude Pepper and Ward & Ward, Miami, for petitioners.
Carl A. Hiaasen and McCune, Hiaasen, Kelley & Crum, Fort Lauderdale, for respondents.
THORNAL, Justice.
By petition for writ of certiorari the petitioners, South Dade Farms, Inc., James Sottile, Jr., and William Sottile, seek reversal of a decree of the Chancellor entered April 22, 1955, adjudging South Dade Farms, Inc., a corporation, in contempt of court for violation of an injunction decree entered June 5, 1953. The contempt order assessed against said corporation a "compensatory fine" in the total amount of $768,260.75. The order also contained a contingent jail sentence for the two individual petitioners, who were officers of the corporation, conditioned on payment of the compensatory fine by the corporation. There was a provision for issuance of writ of execution. The original cause out of which this contempt proceeding follows was previously before this court. See South Dade Farms, Inc., v. Peters, Fla. 1953, 69 So.2d 890.
On June 5, 1953, the Chancellor entered a final decree in the main case whereby it was established that a certain "comprehensive integrated contract" constituting a lease was in existence between the two respondents, Frederick C. Peters and Berenice Todd Peters, as lessees, and the petitioner South Dade Farms, Inc., as lessor. The basic facts with reference to this contract are set out in our opinion in 69 So.2d 890. It is appropriate to repeat herein that the contract so adjudicated established respondents Peters as the lessees of certain lands of South Dade Farms under a lease arrangement dated July 1, 1946, for a five-year period beginning May 1, 1947, and ending April 30, 1952, and which was extended by a document recorded on April 26, 1951, for an additional five-year period to terminate on April 30, 1957. The original lease of 1946 covered two parcels of land generally referred to as parcels 1 and 2 comprising 1,720 acres of potato lands out of a total of approximately 17,000 acres of land owned by South Dade Farms in Dade County.
The initial dispute which produced the lawsuit at the outset involved the extended *893 lease. Peters contended that the extended lease included not only the terms of the original lease but in addition the understanding of the parties as reflected by four letters written by South Dade Farms to Peters in one of which reference was made to the proposition that during the extended five-year term, Peters would make his annual selection of lands for the growing of potatoes "as we have done in previous years." It appears that although the original lease provided that Peters would annually before May 1st select 1,000 acres of land out of the total of 1,720 acres described in parcels 1 and 2, nonetheless, the "custom" had been that Peters would be permitted to make his selection from any and all of the lands owned by South Dade Farms and would not be restricted to parcels 1 and 2.
In the final decree of June 5, 1953, the Chancellor determined that the extended lease was a "comprehensive integrated contract" consisting of the original lease as supplemented by the letters above mentioned plus the formal extension agreement. He decided that the "annual custom" relating to the selection of lands by Peters became a part of the integrated contract and that, therefore, Peters was not limited in his annual selection to the lands described as parcels 1 and 2. The contempt citation and decree now before us arose out of an alleged violation of paragraph 6 of the final decree of June 5, 1953, which reads as follows:
"(6) (a) The defendants, and each of them, be and they are hereby enjoined and restrained from interfering with or impairing the rights of the plaintiffs accruing to the plaintiffs by virtue of the provisions of the aforesaid comprehensive and integrated contract.
"(b) In accordance with the provisions of the original lease of July 1, 1946, which is incorporated and merged in the aforesaid comprehensive and integrated contract,
"`all land contained in Parcels 1 and 2, as hereinabove designated and referred to not thus selected by the Lessees (plaintiffs) or either of them, shall thereupon stand released to the Lessor (South Dade Farms, Inc.) for the then current crop season and may thereupon be leased to others for said season provided said lands shall not be used by anyone during said season for the growing of Irish potatoes.'
"The defendant, South Dade Farms, Inc., and all persons claiming through or under it (other than the plaintiffs and their sub-tenants) be and they are hereby enjoined and restrained from growing Irish potatoes on Parcels 1 and 2 described in said original lease of July 1, 1946." (Emphasis ours.)
We must now ascertain the facts giving rise to the alleged contemptuous conduct of the petitioners.
Pending consideration of the original case and during the month of May, 1953, but several weeks before the final hearing and the entry of the final decree on June 5, 1953, the petitioner South Dade Farms, Inc. executed six leases to six tenants, other than Peters, who are herein generally referred to as "the six tenants" whereby certain lands in parcels 1 and 2 were leased to the tenants for one year (terminating April 30, 1954). By said leases the six tenants were authorized to raise potatoes on the lands leased to them. The record in the original case and the record in this contempt proceeding reveal that this likewise had been an annual custom well known to Peters and his agents. It is clear that despite the provisions of the original lease dated July 1, 1946, the parties had annually followed the custom of permitting Peters to select his acreage without restriction to parcels 1 and 2; that he made his selection on or before May 1st of each year and that after May 1st of each year, South Dade Farms customarily leased portions of parcels 1 and 2 to other tenants for the growing of potatoes. The record in the contempt proceeding reveals that five of the six tenants cited for contempt had annually been leasing these same pieces of land out of parcels 1 and 2 for the growing of potatoes for a period of four to five years; *894 that the tenants were in possession of the same lands as annual lessees of South Dade Farms at the time of the filing of the original complaint in September, 1952, and that Peters or his agents knew all of this and never at any time objected to it until the contempt citation was issued in the matter now before us, on February 25, 1954. In fact, they tacitly consented to the practice in accord with the annual custom.
In considering the alleged contemptuous conduct of South Dade Farms and its six tenants, it should be underscored that the leases to the six tenants were all fully executed and valuable considerations paid in accordance with the annual custom consistently recognized by Peters, well in advance of the entry of the final decree of June 5, 1953, alleged to have been violated. Under these leases South Dade Farms was merely a lessor. It exercised no control whatever over the land during the one-year term of the lease. It did not participate either in the growing of potatoes or in profits derived from the production of potatoes on the land. The rentals were paid when the leases were executed and thereupon for the one-year term of the lease South Dade Farms' authority over the land ended. Further, we should point out that the six tenants were not parties to the original proceeding, and so far as the records reveal when they signed the leases and planted the potatoes, they were never advised that the lands they were leasing were involved in the chancery case pending before the Circuit Court. Some of them received information indicating that the lands were so involved in November, 1953, five months after the decree was entered and six months after they obtained their leases, but even in this regard the advice to them was rather nebulous and in actuality the record fails to reveal that they were ever at any time served with a copy of the injunction decree of June 5, 1953. As a matter of fact, several of the six tenants were nonresidents of Florida and were in the state only periodically during the pendency of the original case. No lis pendens was filed in the original proceeding. Although, by an amended answer filed by South Dade Farms, prior to the entry of the final decree of June 5, 1953, it was brought to the attention of the Chancellor as well as Peters that the lands had been leased during the month of May, 1953, in accordance with the annual custom, no effort whatever was made to bring these six tenants into the case to adjudicate their rights, if any they had, in the primary proceeding then pending before the Court. This record is devoid of any evidence that the tenants and South Dade Farms acted in concert or in any fashion conspired or wilfully collaborated to impede the orderly processes of the law or to construct barriers against the effective administration of justice.
Upon the filing of the mandate of this court, affirming the final decree, on February 23, 1954, the Chancellor at the request of respondents, on February 25, 1954, issued a rule directed to South Dade Farms, Inc., its officers, agents and directors and also the six tenants (who had never previously been parties to the cause) requiring them to show cause why they should not be adjudged in contempt of court for violating the final decree of June 5, 1953, and particularly that portion of the final decree quoted earlier in this opinion.
We interpolate at this point that when the rule to show cause was issued on February 25, 1954, and at the time it was served, the six tenants had raised a crop of potatoes on approximately 560 acres of parcels 1 and 2, but the potatoes had not yet been harvested or marketed. They were still in the ground. The potatoes involved are known to the trade as Florida winter potatoes and they are customarily marketed in March and possibly early April. The form of the proposed rule to show cause as presented to the Chancellor by the respondents contained the following provision:
"(3) The defendant, South Dade Farms, Inc., and Mason W. Alger, Jefferson Davis, W.J. Plotner, Fred Z. Pelletier, The A, B and C. Company (a partnership consisting of John Case and Babbin & Harmon, Inc.,) and Earl K. Harvey, be and they are hereby commanded and directed to forthwith *895 desist from growing or harvesting or marketing Irish potatoes on the aforesaid Parcels 1 and 2."
The record indicates that the Chancellor declined to include the quoted provision in the rule but it was eliminated from the typewritten copies of the rule served on the petitioners and their tenants only by a series of diagonal inked lines which were drawn through the typed paragraph and initialed by the Chancellor in ink showing that he had declined to enter this provision which would have directed the tenants to desist from harvesting or marketing the potatoes then in the ground. Although, admittedly, such an elimination of the provision restraining the harvesting of potatoes would not technically be construed as any grant of permission to do so, nonetheless, in considering the alleged contemptuous conduct of the tenants who were not parties to the original cause, one might readily conclude that to the lay mind the elimination of the quoted provision in the manner above described would suggest that the judge had been requested to prohibit the tenants from harvesting the potatoes and had refused to prohibit them from doing so. This was in truth exactly what happened. It was actually an indication to the six tenants that they would not be going contrary to the decree of the court if they then proceeded to harvest the crop because the court declined to prohibit them from doing so. The foregoing observation is not controlling but it is an element to consider.
The petitioners and the six tenants responded to the rule and the cause then proceeded to the taking of testimony on the question of the alleged contemptuous conduct. At the outset the court ruled that this was a civil rather than a criminal contempt proceeding. There is a substantial difference as we shall see. The respondents who were plaintiffs below were seeking the aid of the court's contempt powers to enforce the final decree in their behalf; to determine the extent of damages, if any, suffered by them as the result of the alleged violation of the decree and to assess against the alleged contemnors a "compensatory fine" payable to the respondents, plaintiffs below, in an amount equal to the damages suffered by them and their associates, plus their costs, expenses and reasonable attorneys' fees occasioned by the alleged contempt.
Except as to the amount of damages there was little conflict in the testimony. The facts summarized above were all revealed by the record in the contempt proceeding supplemented by the record in the main case which we have examined again in this proceeding.
On the question of damages it was reliably estimated that for the 1953-1954 winter season the six tenants produced and marketed from the 560 acres of so-called "forbidden lands" in parcels 1 and 2 a total of 190,000 sixty-pound bushels of potatoes. During the 1953-1954 season a total of 3,450,000 sixty-pound bushels of winter potatoes were marketed out of Dade County. The respondents contended that they were entitled to damages in the form of a "compensatory fine" to be measured by the adverse effect on the price that they received for their winter potatoes in 1953-1954 season resulting from the alleged wrongful production of 190,000 bushels. Peters was not primarily engaged in the planting and harvesting of potatoes. His principal objective in leasing lands from South Dade Farms was to enable him to obtain potato lands to be subleased to members of a potato growers co-operative organized by him and known as Farsouth Growers Co-operative Association. The potatoes raised by Farsouth through its members were then marketed through another co-operative likewise organized by Peters, known as Tropical Agricultural Co-operative Association, herein referred to as TACA. By a method of relating the influence of total production of winter potatoes in Dade County to the price received by TACA over a period of seven years and by contrasting this relationship with the relationship between national potato production and the so-called United States' potato price, indicating the influence of production on price, and by correlating these relationships in accordance with a scientific method known as the "Multiple Graphic Curvilinear Correlation" *896 method, the plaintiffs produced "expert" testimony to show that the production and marketing of 190,000 bushels of winter potatoes during the 1953-1954 crop season on the 560 acres of "forbidden lands" had the effect of decreasing the price of potatoes received by the plaintiffs and their associates to the extent of $1.00 per bushel. It was then a matter of mathematics for the Chancellor to conclude that the plaintiff Peters and his three sons for whom he allegedly acted grew a total of 275,335.83 bushels of winter potatoes during the 1953-1954 season, and that therefore for the alleged violation of the decree the petitioner South Dade Farms should pay to Peters for the use and benefit of himself and his three sons a "compensatory fine" in the amount of $275,335.83. The three sons were not parties to the cause. It was likewise mathematically determined that other members of Farsouth Growers Co-operative (none of whom were parties to the cause) produced 392,920 sixty-pound bushels of potatoes in the same season and that South Dade Farms should pay to Peters for the benefit of the members of Farsouth, for whom he also allegedly acted a "compensatory fine" in the amount of $392,920. The balance of the "compensatory fine" directed to be paid consisted of attorneys' fees and routine litigation expenses found by the court to be a combined total of $70,004.92. Again, using simple arithmetic, it will be observed that these three figures produced a total "compensatory fine" of $738,260.75. Petitioners likewise offered "expert" testimony to the effect that the potato price was depressed about six cents per bushel by the questioned production.
As to the six tenants the Chancellor concluded that they too were in contempt but that their contempt was less culpable than that of South Dade Farms, Inc. Against the six tenants there was assessed a "compensatory fine" in the amount of $35,000, plus one-half of the attorneys' fees and expenses. There is no record evidence of how the figure of $35,000 was reached. It was provided that the fines paid by the tenants should be credited against the fine assessed against South Dade Farms, Inc. There was also a contingent jail sentence and provision for writ of execution. See our opinion filed this date in Alger v. Peters, Fla., 88 So.2d 903, in the appeal filed by the "six tenants."
In addition to assessing the fines with the contingent provisions for imprisonment, the trial judge in the contempt decree reserved jurisdiction for the enforcement of the same and provided that if South Dade Farms and its tenants should violate the original final decree in the future, the court would entertain appropriate proceedings at the instance of the plaintiffs below for the imposition of further "coercive" as well as further "compensatory" fines. He denied a "coercive fine" at this time feeling that the "compensatory fine," because of its size, was sufficiently punitive in effect.
By their petition for writ of certiorari the petitioners seek reversal of the contempt decree on numerous grounds including the following: there was no proof of contempt of the final decree of June 5, 1953, by South Dade Farms, Inc.; that the constitutional rights of South Dade Farms and its officers have been violated in that a judgment has been entered against them without due process of law; that the contract as adjudicated by the original decree and proposed to be enforced by the contempt decree is void, in violation of Chapter 542, Florida Statutes, F.S.A., said act prohibiting contracts in restraint of trade; that the compensatory fine, coupled with the contingent jail sentence, constitutes cruel or unusual punishment; that the evidence of damage is so highly speculative that it lacks all probative value; and finally that the compensatory fine was assessed in behalf of persons not parties to the original cause.
The respondents, to support the contempt decree, assert that the final decree of June 5, 1953, was unassailable by South Dade Farms, Inc., the main defendant in the original suit as well as by the six tenants of said defendant who were not parties to the main case, that the court below had inherent and statutory power to adjudge the contempt; that the compensatory fine and coercive jail sentence were proper. Respondents also cross-assign errors contending that the *897 Chancellor did not apply adequate sanctions against the contemnors for failure to answer certain interrogatories; that the attorneys' fee allowed respondents' counsel was inadequate; that the fine assessed against the six tenants was inadequate; and finally that in addition to the compensatory fine, the Chancellor should have assessed a substantial coercive fine.
In view of the strenuous contest of this matter in the lower court as well as the exhaustive and able briefs of counsel for all parties and because of the importance of the questions raised, we have summarized above in considerable detail the facts appearing in the record as well as the contentions offered by the contesting parties. We proceed next to a consideration of the legal principles applicable.
There can be no doubt of the authority of a court to administer appropriate punishment for contemptuous conduct of parties bound by its decree. This power has been recognized as a part and parcel of our judicial system. The reasons for it are almost obvious. They are well stated in the opinion of the late Justice Davis in Seaboard Air Line R. Co. v. Tampa Southern R. Co., 101 Fla. 468, 134 So. 529, 532, as follows:
"And if, upon the examination of the record, it should appear that the defendant was in fact guilty of the contempt charged, there would be no more important duty than to give such direction to the court below as would serve to vindicate its jurisdiction and authority to enforce its order and to redress acts of disobedience to them.
"For, while the power to punish for contempt of a civil or criminal nature is to be sparingly used, it is a necessary and integral part of the judicial power, and is absolutely essential to the performance of the duties imposed by law upon courts of equity. Without it, such courts are mere boards of arbitration, whose judgments and decrees are only advisory. If a party can make himself a judge of the validity of orders which have been issued for the protection of property rights, and by his own act of disobedience can set them aside, then are the courts impotent, and what the Constitution of the state ordains as the judicial power becomes a mere mockery.
"This power has uniformly been held indispensable to enable the court to enforce its judgments and to execute its orders necessary to the due administration of law and the protection of the rights of citizens.
"Where a defendant has interfered with property in violation of an injunction, he may properly be required to restore the property interfered with to its former condition, or the court may make an alternative order giving the defendant the chance to make restitution before passing sentence of fine or imprisonment."
In the opinion last cited this court adopted the language of the Supreme Court of the United States in the leading case of Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 501, 55 L.Ed. 797, from which we quote also the following:
"There has been general recognition of the fact that the courts are clothed with this power, and must be authorized to exercise it without referring the issues of fact or law to another tribunal or to a jury in the same tribunal. For, if there was no such authority in the first instance, there would be no power to enforce its orders if they were disregarded in such independent investigation. Without authority to act promptly and independently the courts could not administer public justice or enforce the rights of private litigants. Bessette v. W.B. Conkey Co., 194 U.S. 324 337, 24 S.Ct. 665, 48 L.Ed. [997] 1005."
Contempt powers have been recognized by statute in Florida. Section 38.22, Florida Statutes, F.S.A., provides:
"Every court may punish contempts against it, whether such contempts *898 be direct, indirect, or constructive, and in any such proceeding the court shall proceed to hear and determine all questions of law and fact, but the punishment imposed by a justice of the peace shall not exceed twenty dollars fine, or twenty-four hours' imprisonment."
Admitting the basic authority of the trial judge to exercise the power in an appropriate case, we come next to seek an understanding of what will constitute contemptuous conduct. By Section 38.23, Florida Statutes, F.S.A., contempt of court is defined as follows:
"A refusal to obey any legal order, mandate or decree, made or given by any judge either in term time or in vacation relative to any of the business of said court, after due notice thereof, shall be considered a contempt, and punished accordingly. But nothing said or written, or published, in vacation, to or of any judge, or of any decision made by a judge, shall in any case be construed to be a contempt."
We also find a helpful definition in Oswald, Contempt of Court, page 5, from which we quote as follows:
"Contempt of Court (which has been irreverently termed a `legal thumbscrew') is so manifold in its aspects that it is difficult to lay down any exact definition of the offense. `It is defined or described to be a disobedience to the Court, an opposing or a despising the authority, justice, or dignity thereof. It commonly consists in a party's doing otherwise than he is enjoined to do, or not doing what he is commanded or required by the process, order, or decree of the Court'."
See also Miami Law Quarterly, Vol. IX, No. 3, p. 281.
With an understanding of the nature of the offense as well as the power of the courts to administer appropriate punishment or relief, we are next admonished to observe caution in the exercise of the admitted authority in view of the summary nature of a contempt proceeding and its potentialities for impinging upon the orderly requirements of due process. In Seaboard Air Line R. Co. v. Tampa Southern R. Co., supra, it was pointed out that "the power to punish for contempt of a civil or criminal nature is to be sparingly used * * *." On pages 17 and 18 of Oswald, Contempt of Court, we find a similar warning as follows:
"It should always be borne in mind in considering and dealing with contempt of Court that it is an offense purely sui generis, and that its punishment involves in most cases an exceptional interference with the liberty of the subject, and that, too, a method or process which would in no other case be permissible, or even tolerated. It is highly necessary, therefore, in all questions of this nature where the functions of the Court have to be exercised in a summary manner, that the Judge in dealing with the alleged offence should not proceed otherwise than with great caution and deliberation, and only in cases where the administration of justice would be hampered by the delay in proceeding in the ordinary course of law; and that when any antecedent process has to be put in motion, every prescribed step and rule, however technical, should be carefully taken, observed, and insisted upon. The jurisdiction should be exercised the more carefully in view of the fact that the defendant is usually reduced, or pretends to be reduced, to such a state of humility, in fear of more severe consequences if he shows any recalcitrancy, that he is either unable or unwilling to defend himself as he otherwise might have done." (Emphasis ours.)
The suggested caution in the exercise of the power, however, should not be construed as a restriction in any case where it is appropriate for a court to assert the authority whether it be in criminal or civil contempt.
*899 This leads us then to a consideration of the classes of contempt and some of the distinctions between the recognized classes. We take note of the fact that at the initial hearing on the response to the rule to show cause in the case before us, it was ruled by the trial judge that this was a civil contempt proceeding. The matter was tried on that basis. The distinction between civil and criminal contempt is of some consequence. The differences are clearly delineated by the Supreme Court of the United States in Gompers v. Buck's Stove & Range Co., supra, and are recognized by this court in Seaboard Air Line R. Co. v. Tampa Southern R. Co., supra. Fundamentally, a criminal contempt proceeding is between the public and the defendant. It is not directly a part of the original cause. It involves punishment for an offense against the court itself as distinguished from the commission of an act in derogation of the rights of a party to the cause. A civil contempt proceeding naturally involves in some measure a transgression against the dignity of the court and the prestige of its order, however, it is in actuality a proceeding between the parties to the cause and is instituted and tried as a part of the main case. It should be considered more nearly in the nature of a civil proceeding between the parties, and to the extent appropriate rules governing civil causes should apply. When a judgment or decree in favor of one party is disregarded or violated by another party to the injury of the former, it is then appropriate for the injured party to call upon the court to exercise its contempt powers in the enforcement of its decrees for the benefit of the party in whose favor the decree has been entered.
In an appropriate civil contempt case the court may compel performance of a required act by coercive imprisonment or in the event that the violation of the decree has resulted in damages to the injured party, there is adequate authority to support the assessment of a "compensatory fine" to be paid by the wrongdoing party to the party injured. The expression "compensatory fine" seems to have found its way into the law governing contempt in Gompers v. Buck's Stove & Range Co., supra. It was indirectly recognized by our opinion in Seaboard Air Line R. Co. v. Tampa Southern R. Co., supra. Although in 17 C.J.S., Contempt, § 94, p. 137, it is stated:
"The power of the court to award indemnity to the injured party usually rests on statute",
nevertheless, the history of civil contempt proceedings sustains the conclusion that the power to impose a compensatory fine to the extent of the damages suffered by the injured party inheres in the court whose decree has allegedly been violated.
Rapalje in his treatise on Contempt, Sec. 131, recognized the authority of the court to impose a fine as indemnity to an injured party in a civil action resulting from disobedience of an order or decree. Moskovitz in writing on "Contempt of Injunctions, Civil and Criminal" in 43 Columbia Law Review 780 (p. 804) suggests that although there is some authority to the effect that the power to assess an indemnifying fine rests solely on statute, there is nevertheless equal authority to support the position that the power to grant such fine is inherent unless restricted by statute.
This court very early in its history in some measure recognized the inherent power of a court of equity to assess damages in favor of an injured party to be paid by a party violating a decree. See Ex parte Edwards, 11 Fla. 174. We are of the view that in a proper case there is adequate precedent to support the imposition of a "compensatory fine" in civil contempt proceedings. See also: Beale, "Contempt of Court, Criminal and Civil," 21 Harvard Law Review 161 (p. 170); 26 Georgetown Law Journal 719; Hanna v. Martin, Fla. 1950, 49 So.2d 585; Wells, Fargo & Co. v. Oregon Ry. & Nav. Co., C.C., 19 F. 20; "Standards of Punishment in Contempt Cases," 39 California Law Review 552.
Having ascertained many of the basic principles of law applicable to the matter, we now proceed to a consideration of the ultimate problem which is whether or not *900 the petitioners were guilty of contemptuous conduct that justified the assessment of the fine and the entry of the contempt decree which is here under attack.
By referring to the injunctive provisions of the final decree of June 5, 1953, it will be observed that the petitioner South Dade Farms, Inc. was "enjoined and restrained from interfering with or impairing the rights of" the respondents Peters under the integrated contract and further that said petitioner and others who were not parties were "enjoined and restrained from growing Irish potatoes on Parcels 1 and 2 * * *" The first quoted injunction was applicable only to the defendants to the original cause which did not include the six tenants. See Annotation 15 A.L.R. 386. The second portion quoted enjoined South Dade Farms, Inc. and others (describing but not specifically naming them) from "growing Irish potatoes." The recitals in the contempt decree purporting to show that South Dade Farms, Inc. was guilty of contemptuous conduct stated that after the decree, the six tenants used portions of parcels 1 and 2 for Irish potato growing, that South Dade Farms executed the leases to the six tenants after receiving the Peters selection letter, dated March 16, 1953, but in no place finding that the leases were executed after the final decree.
The contempt decree further finds that South Dade Farms took no steps to prevent the six tenants from planting potatoes. The record shows that South Dade Farms executed the leases to the six tenants several weeks prior to the final decree of June 5, 1953. This record does not support any conclusion that these leases were executed in bad faith or out of any collusive effort to avoid the decree of the lower court. In fact, such would have been impossible for the simple reason that the lower court did not enter its decree until many days after the leases were executed. There is no evidence whatever that South Dade Farms, Inc. took any steps at all toward the growing of potatoes on parcels 1 and 2 after the entry of the decree. The record clearly shows that the petitioners did not engage in the growing of potatoes and it is certainly clear that these petitioners did not grow any potatoes on the so-called "forbidden lands."
Prior to the entry of the final decree the petitioner South Dade Farms executed the leases to the six tenants. This was not contempt of court, although it might have been a breach of contract, a question which we certainly do not undertake to settle herein. As between South Dade Farms and the six tenants the leases were binding obligations and the final decree gave no directions whatever that the leases be cancelled. The respondents knew about the leases and knew of the annual use of parts of parcels 1 and 2 for potato growing. Neither the validity of the leases nor the rights of the six tenants under them were adjudicated by the final decree. They couldn't be. The tenants were not parties and there was no legal orbit within which South Dade Farms, Inc. could move for cancellation as between itself and the six tenants.
We are not here concerned with the problem of whether South Dade Farms, Inc. breached a pre-existing contract with Peters thereby giving rise to a cause of action at law for damages. We are limited in the matter before us to a determination of whether South Dade Farms, Inc. committed acts which constituted a contempt of court by violating or failing to comply with the injunctive provisions of the final decree.
A decree cannot be violated in advance of its entry and it cannot be made retroactive so as to establish a violation by the acts of parties committed before the decree was entered.
In Joyce on Injunctions, Vol. 1, Sec. 41, it is stated:
"No injunction for past acts.  An injunction is for the most part preventive, and cannot ordinarily be employed to correct a wrong already done or restore to a party rights of which he has been deprived."
*901 In Davis v. Wilson, 139 Fla. 698, 190 So. 716, 719, this court held:
"It is likewise well settled in this state that an injunction will not be issued to restrain an injurious act already committed. Pensacola & Ga. R. Co. v. Spratt, 12 Fla. 26, 91 Am.Dec. 747; Smith v. Davis, 22 Fla. 405; relief, if any, being in a court of law. Wilkinson v. Woodward, 105 Fla. 376, 141 So. 313; Hernandez v. Board of Commissioners of Hillsborough County, 114 Fla. 219, 153 So. 790." (Emphasis ours.)
In line with the foregoing authorities we are of the view that this case is controlled by the rule followed in the decision of this court in Smith v. Whitfield and Sanders, 38 Fla. 211, 212, 20 So. 1012, 1016. An examination of the facts in the case cited will show that they are peculiarly analogous to the present situation. In Smith v. Whitfield and Sanders, supra, Smith filed suit against Whitfield and Sanders seeking an injunction to restrain them from digging or removing, selling or encumbering, phosphate deposits from certain land. On December 26, 1895, an injunction pursuant to the prayer of the complaint was granted. The injunction was dissolved January 3, 1896. An appeal was filed January 31, 1896. On January 27, 1896, four days before notice of appeal, Whitfield and Sanders executed a contract to Anglo-Continental Guano Works authorizing that company to remove and dispose of phosphate on the land covered by the dissolved injunction. On February 3, 1896, the order dissolving the injunction was superseded and this had the effect of restoring as of that date the restraining order. Between January 27, 1896 and April 11, 1896, Anglo-Continental Guano Works through its agents removed and disposed of phosphate rock on the land in question. Whitfield and Sanders and one Trubenbach, agent of Anglo-Continental, were cited for contempt of court for violating the original injunction which had been reinstated by the supersedeas order. Because of its peculiar applicability to the situation now before us, we quote at length from the opinion of the court reaching the conclusion that no contempt was established and discharging the rule nisi as follows:
"* * * The appeal subsequently entered from the order dissolving the injunction mentioned did not of itself reinstate the injunction, but the order directing it to operate as a supersedeas, and the compliance with the terms thereof, did have that effect. McMichael v. Eckman, 26 Fla. 43, 7 So. 365. While the supersedeas had the effect stated, it is not contended, as we understand, that it would retroact, so as to deprive strangers to the litigation of intervening rights bona fide acquired. In our opinion, it could not have such effect. Archer v. Hart, 5 Fla. 234; State v. Johnson, 13 Fla. 33. Under the showing made, the Anglo-Continental Guano Works obtained, not only the actual possession of the rock for valuable consideration paid, but, as against Whitfield & Sanders, the absolute right of disposing of the same, and that, too, before any appeal was entered or supersedeas granted. [First National] Bank [of Pensacola] v. Wittich, 33 Fla. 681, 15 So. 552. It is insisted that the entire dealing between Whitfield & Sanders and Trubenbach was a subterfuge resorted to for the purpose of evading the supersedeas, and that the transaction of January 27th did not really take place at that time, but was an afterthought. If we were satisfied that such was the case, prompt punishment would be visited upon all parties concerned; but a careful examination of the evidence does not impress us with this view. The contracts made in 1894 were before any litigation arose between Smith and Whitfield & Sanders, and were undoubtedly genuine; and there is really no impeachment of the showing that the transaction of January 27, 1896, did at that time take place. The agent of the Anglo-Continental Guano Works would not, in our judgment, subject himself to liability as for a criminal contempt in asserting whatever rights *902 his company bona fide acquired by paying for and taking possession of the rock before the supersedeas was granted. Whether the rights acquired by the Anglo-Continental Guano Works were in fact superior to Smith's is not involved, and, if he desired to question such rights, he should have impleaded the company in some way. The rule charges Trubenbach with aiding and assisting Whitfield & Sanders in moving the rock on the 6th of April, 1896. The testimony does not show any aiding and assisting in the shipment on the part of Trubenbach, but it appears that he alone was the moving party in what was done. Contempt proceedings are criminal in their character, and some strictness is required. Whether a charge for aiding and assisting another in doing an act will be sustained by proving the doing of the act by the party alone, we need not consider, as the rule against Trubenbach must be discharged for the reasons given.
"As to Whitfield, there is no ground for complaint. It appears from his testimony, not contradicted, that before the 27th day of January, 1896, he had sold his interest in the firm of Whitfield & Sanders, and it is not shown that he had anything to do with the shipping of the rock in April following. He does say that Sanders negotiated the transaction of January 27th, by which the rock was transferred and delivered to the Anglo-Continental Guano Works, and that he Whitfield knew of it, and approved it. But at that time there was no injunction pending against the selling or removal of the rock, as no appeal had then been entered from the order dissolving the injunction granted; and the testimony of all parties concerned is to the effect that the transaction of January 27th, by which the Anglo-Continental Guano Works acquired the possession and control of the rock, was in good faith, and for a bona fide consideration. The proof is not sufficient to show that Whitfield had any agency in the removal of the rock in April, and we have no hesitancy in discharging the rule as to him.
"Sanders did not in person engage in the removal of the rock, nor did he assert any ownership or control over the same after the 27th of January, 1896. But while he did not, so far as the evidence shows, personally direct the removal of the rock, nor personally engage in its removal, his conduct in reference to the same is such as to bring him under condemnation for a violation of the order of this court, had he been in possession or control of the property when the supersedeas was perfected. He was present when Gibson was having the rock put on the cars, and said nothing about the supersedeas. He notified, as he admits, parties that they could get employment in loading the cars, and on one occasion took money from Trubenbach out to the mine, for the hands engaged in loading the cars, and did other things inconsistent with the proper observance of the mandate of a court in reference to the property, had it been in his possession or subject to his control. If delivery had not been made before the supersedeas was perfected, though an agreement for the transfer had previously been entered into, neither Whitfield nor Sanders could, under the terms of the supersedeas order, have subsequently made delivery of the property, or passively stood by, and allowed it to go out of their possession; but that was not the case. Actual transfer and delivery of the rock to the Anglo-Continental Works were made before Smith entered his appeal, and Whitfield & Sanders had no further control over the property at that time. It not being a criminal violation of the supersedeas order for the company to assert such rights as it had acquired before the same was granted, what Sanders did was not in furtherance of an illegal purpose. Our conclusion is that the *903 rule nisi should be discharged generally as to all the defendants." (Emphasis ours.)
The opinion in Smith v. Whitfield and Sanders, supra, has never been overruled nor has there been any recession from it. As a matter of fact, it appears to us to be of some significance that although petitioners rely heavily thereon in their brief in support of the petition, the respondents in their reply brief do not comment on the case or in any way undertake to distinguish it.
The principle applied in the case last cited was again applied by this court in Lewis v. Kelly, Fla. 1954, 75 So.2d 761, involving an injunctive order of March 4, 1953, against a pledge of certain stock. It was shown that the stock had been pledged some fifty-six days prior to the entry of the decree. In the opinion Mr. Justice Terrell raised the question, "If there was no injunctive order in effect at the time Lewis pledged his stock on January 7, 1953, how could he have been said to have wilfully violated one?" We answered the question with the holding that the pledge executed prior to the injunctive decree could not in any fashion be construed as a violation of the decree.
In Parker v. United States, 1 Cir., 135 F.2d 54, it was held that the acts of a party to a cause prior to the entry of an injunctive order are not contemptuous of the order subsequently entered regardless of the ultimate effect of the party's conduct on the ultimate rights of the opposing party to the cause.
This record completely lacks evidence of any contemptuous conduct of petitioners after the entry of the decree of June 5, 1953. They cannot be held in contempt of court for the described acts which were committed before the decree was entered.
Being aware of the rule which extends great weight to the decree of a trial court adjudging a party to a pending cause to be in contempt of a decree of the court, we have cautiously reviewed the entire record and have carefully analyzed and considered each and all of the authorities cited to us in the briefs of all of the parties. Having come to the conclusion that the conduct revealed by the record could not as a matter of law amount to a civil contempt, we do not consider it necessary to pass upon the multitude of other questions raised, our decision on the main question being controlling.
Despite our respect for the sanctity of judicial decrees and a high regard for the Chancellor who entered the decree under attack, we fail to find in this record adequate evidence to support the contempt decree assaulted by the petitioners.
For the reasons stated, the petition for writ of certiorari is granted, the contempt order of April 22, 1955, appealed from is quashed, and the cause is remanded with directions to dismiss the rule to show cause.
DREW, C.J., and TERRELL, THOMAS and HOBSON, JJ., concur.
ROBERTS and O'CONNELL, JJ., not participating.